**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 25-10482 (MG) |
| Odebrecht Engenharia e Construção S.A. - Em Recuperação Judicial, *et al.*, | Chapter 15 |
| Debtors in a Foreign Proceeding. | |

## MEMORANDUM OPINION GRANTING MOTION FOR RECOGNITION OF FOREIGN MAIN PROCEEDINGS AND OVERRULING UST OBJECTIONS

*A P P E A R A N C E S*:

CLEARY GOTTLIEB STEEN & HAMILTON LLP
*Attorneys for the Foreign Representative of Odebrecht Engenharia e Construção S.A.*
*- Em Recuperação Judicial and affiliated debtors*
One Liberty Plaza
New York, New York 10006
By:    Luke A. Barefoot, Esq.
       Thomas S. Kessler, Esq.

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, NY 10004
By: Greg M. Zipes, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

This Court has already entered an order ("Order," ECF Doc. 21) granting all the relief

requested by the foreign representative (Adriana Henry Meirelles, or "Foreign Representative")

of the above-captioned foreign debtors ("Debtors"): recognizing the Debtors' Brazilian

*recuperação judicial* ("RJ") proceeding as the Debtors' foreign main proceeding, recognizing the

full force and effect of the subsequent RJ plan ("RJ Plan"), giving full force and effect to the

related Brazilian court confirmation order, and providing further relief which this Court deemed

just and proper.  No party objected to the recognition of the Brazilian RJ proceeding as the

foreign main proceeding, nor to the recognition and enforcement of the RJ Plan in the United

States. The only objection was filed by the United States Trustee ("UST"), which objected to

language in the Debtors' proposed order[1] which provided additional relief. ("Objection," ECF

Doc. # 16.) The Foreign Representative filed a reply ("Reply," ECF Doc. # 18).

The Court entered the Debtors' final proposed order without further modifications. The

Court now writes separately to address two of the UST's objections, both of which were

overruled at the hearing, to provide further clarification, as the UST has made similar objections

in multiple Chapter 15 cases.

## I.    BACKGROUND

### A.  Company Structure and History

The Debtors, along with certain other related entities and affiliates (the "OEC Group"),

are part of the business division of Novonor S.A. – Em Recuperação Judicial ("Novonor") and

its related entities and affiliates (the "Novonor Group"), one of the largest private business

groups in Brazil today, with businesses in engineering, construction and in the development and

operation of infrastructure. (ECF Doc. # 2 at 3.) The OEC Group is one of the largest

construction companies in the world and employs over 17,000 people. (*Id.* at 10.) The OEC

Group's operational and economic activities are primarily concentrated in Brazil. (*Id.* at 12.)

The Foreign Representative's motion seeking recognition and enforcement of the RJ Plan

provides additional details on each of the Debtors and on the OEC Group as a whole. (*See*

*generally id.*)

The Debtors or their affiliates have filed two previous Chapter 15 proceedings. On

August 26, 2019, Novonor (formerly known as Odebrecht S.A.) and certain affiliates (the

---

[1]    The proposed order was edited twice, but the language to which the UST objected remained the same
throughout. This opinion therefore relies on the language in the order ultimately entered, *see* ECF Doc. # 21.

"Novonor Debtors") filed a petition ("Novonor Petition") seeking recognition of the jointly

administered judicial reorganization proceeding pending at the time before a Brazilian court.  (*Id.*

at 3 n.3.)  On September 18, 2019, this Court entered an order granting the relief sought in the

Novonor Petition and recognizing the Brazilian RJ proceeding as a foreign main proceeding for

all the Novonor Debtors.  (*Id.*)  A bit over a year later, on November 24, 2020, a subset of three

of the Debtors sought recognition of an extrajudicial reorganization (*recuperação extrajudicial*,

or "EJ") and enforcement of an agreed plan of reorganization ("EJ Plan") which had been

approved by the First Bankruptcy and Judicial Recovery Court of the District of the Capital of

the State of São Paulo.  (*Id.* at 3–4.)  The aim of the Brazilian EJ Proceeding was to optimize the

OEC Group's capital structure and provide additional runway for the OEC Group to reach an

environment favorable to the resumption of its growth.  (*Id.*)  The EJ Plan only involved the

obligations of a subset of the current set of Debtors and resulted in the replacement of certain

New York law-governed notes with new notes, enabling a restructuring of a financial liability

exceeding $3.1 billion.  (*Id.* at 4–5.)

    Due to the pressures of the pandemic, a financial crisis in Brazil, a reduction in

infrastructure investments, and lower demand for infrastructure projects in countries where the

OEC Group operates, a broader restructuring became necessary.  (*Id.* at 5.)  In June 2024, the

Debtors filed the Brazilian RJ Proceeding to implement a comprehensive restructuring of the

OEC Group's liabilities to ensure the preservation and continuation of its business through an

agreed plan of reorganization (the RJ Plan).  In broad strokes, the RJ Plan involves (i) a

restructuring of the OEC Group's existing capital structure both to satisfy the OEC Group's

existing debt and strengthen its cash flow; (ii) the creation of a new business unit, with a healthy

capital structure and high technical capacity; and (iii) an injection of liquidity to finance future

3

projects through a minimum $120 million debtor-in-possession financing facility, subject to certain conditions precedent being met. (*Id.* at 6.) After two rounds of voting, the ultimate result was a resounding vote in favor of the RJ Plan by the creditor classes and claimants present to vote, and after resolving certain objections and finding that the requisite amount of creditor support and all other legal requirements were met, the Brazilian court issued an order confirming the RJ Plan (the "Brazilian Confirmation Order") on March 7, 2025. (*Id.* at 26–28.)

On March 14, 2025, the Foreign Representative filed in this Court a motion for recognition and enforcement, along with a proposed order and a copy of the RJ Plan. (ECF Doc. # 2.) The proposed order was modified before becoming the ultimate Order, but the relevant provisions, excerpted below, did not change. The United States Trustee objected to portions of the proposed order, as discussed below.

### B.  Terms of RJ Plan

The only term of the RJ Plan that matters for the following discussion can be found at clause 11.5 of the RJ Plan:

> 11.5. Settlement. The fulfillment of the payment obligations in accordance with the terms and conditions established in this Plan will entail, automatically and regardless of any additional, broad, general and unrestricted formality, the discharge of all Bankruptcy Credits against the Companies under Reorganization and their officers, directors, agents, employees and representatives.

(Objection at 5 (citing RJ Plan).) All parties agreed during the recognition hearing that this provision does not constitute a nonconsensual third-party release.

### C.  UST Objection

The UST objected to portions of the proposed order granting recognition (but *not* to the recognition of the Brazilian RJ proceeding or to the enforcement of the RJ Plan as written). The

Court overruled the UST's objections.  However, two of the UST's objections merit further

discussion, as they have recurred throughout multiple Chapter 15 cases.

First, the UST argued that the following limitation on liability is inappropriate because it

is a "veiled exculpation clause," it goes beyond the relief granted by the Brazilian court, and

there is no statutory basis for granting the limitation:

> The Directed Parties[2] and their respective officers, directors, employees,
> representatives, advisors, attorneys, professionals and managers, in each case,
> solely in their respective capacities as a Directed Party, shall be entitled to a full
> limitation of liability from and shall have no liability for any and all claims,
> obligations, suits, judgments, damages, rights, causes of action, liabilities from, or
> in connection with, any action or inaction taken in furtherance of and/or in
> accordance with this Order, these Chapter 15 Cases, the Brazilian RJ Proceeding,
> the Brazilian Confirmation Order and the RJ Plan, except for any liability arising
> from any action or inaction constituting gross negligence, fraud, willful misconduct
> or professional malpractice as determined by this Court.

(Order ¶ 7; Objection at 11.)  Assuming *arguendo* that the limitation on liability is appropriate,

the UST also objected on the grounds that the limitation "lacks the hallmarks of an acceptable

exculpation provision in a chapter 11 proceeding": there is no temporal limitation, and the clause

creates "prospective immunity by exculpation."  (Objection at 13–14.)  Furthermore, the UST

argued, the exculpation applies to too many parties—it applies to anyone in connection with

"any action or inaction taken in furtherance of and/or in accordance with this Order, this Chapter

15 Case, the Brazilian RJ Proceeding, the Brazilian Confirmation Order and the RJ Plan," so the

exact parties to whom the exculpation applies are not known, and it also covers non-estate

fiduciaries.  (*Id* at 15.)  (The UST also objected to the absence of a carveout for bad faith, breach

of fiduciary duty, and legal malpractice, all of which are required by the New York Rules of

---

[2]      The "Directed Parties" are: (i) The Bank of New York Mellon, as the indenture trustee (the "Indenture
Trustee") under the indentures related to the 2024 Notes, the 2026 Notes, the 2027 Notes, the 2029 Notes, the 2033
Notes, the 2046 Notes, and the Perpetual Notes (collectively, the "NY Notes"); (ii) the Depository Trust Company
("DTC"), Euroclear Bank S.A./N.V., and/or Clearstream Banking, Société Anonyme, as clearing systems, as
applicable; (iii) Epiq Corporate Restructuring LLC; and (iv) the custodians of the NY Notes. (Order ¶ 5 n.3.)

Professional Conduct; the Order was amended to include a carveout for malpractice claims.)

Second, the UST argued that the proposed order created impermissible nonconsensual third-party

releases.  As compared to the release of the debtors contemplated by the RJ Plan (cited above,

Section 11.5 of the RJ Plan), the order provides as follows:

> Except as provided in paragraph 12 of this Order, all persons and entities are
> permanently enjoined and restrained from (i) commencing or taking any action or
> asserting any claim, within the territorial jurisdiction of the United States, that is
> inconsistent with, in contravention with, or would interfere with or impede the
> administration, implementation and/or consummation of the RJ Plan, the Brazilian
> Confirmation Order or the terms of this Order; and (ii) taking any action against the
> Debtors or their property located in the territorial jurisdiction of the United States
> to recover or offset any debt or claims that are extinguished, novated, cancelled,
> discharged or released under the RJ Plan and the Brazilian Confirmation Order. No
> action may be taken within the territorial jurisdiction of the United States to confirm
> or enforce any award or judgment that would otherwise be in violation of this Order
> without first obtaining leave of this Court.

(Order ¶ 11.)  The UST took the position that (1) this language creates "an expansive third-party

release" because it "enjoins *all persons and entities* from *taking any action*."  (Objection at 16–

17.)  The UST argued that section 1521(a) of the Code does not provide courts with a statutory

basis for issuing orders which contain third-party releases: applying the canon of *ejusdem*

*generis* as the Supreme Court did in *Harrington v. Purdue Pharma*, 603 U.S. 204 (2024)

(henceforth "*Purdue*"), the UST claimed that third-party releases are "not similar in nature to the

relief provided in section 1521(a)" because third-party releases are not designed to protect a

debtor (unlike the provisions of section 1521(a)), so cannot fit under that subsection of the Code.

(Objection at 17–18.)  The UST also argued that the release supposedly created by the above

section of the Order does not fall within the category of "appropriate relief" under section

1521(a) of the Code because "third-party releases may not be imposed without consent through a

bankruptcy plan under United States law," citing *Purdue*.  (*Id.* at 18.)

6

### D.  Foreign Representative's Reply

The Foreign Representative's reply can be summarized as follows.  First, the language of the order limiting liability is customary and similar to language this Court approved in other chapter 15 cases.  (Reply at 4–5.)  Second, the provision in Section 11.5 of the RJ Plan is proper under both Brazilian and U.S. law, as it does not create a third-party release.  (*Id.* at 5–6.)  The Foreign Representative then argued that the UST misread the language of the proposed confirmation order, as it does not create a wide-reaching release but rather bars only those "actions that contravene relief set forth in the RJ Plan and Brazilian Confirmation Order" —i.e., the order sought only "enforcement of the relief granted in the Brazilian RJ Proceeding within the territorial jurisdiction of the United States and nothing more."  (*Id.* at 6.)  Even if Section 11.5 of the RJ Plan did create nonconsensual third-party releases, however, the Foreign Representative maintained that enforcement of such a provision is acceptable because *Purdue* does not apply in Chapter 15 cases.  (*Id.* at 7–9.)

## II.    <u>LEGAL STANDARD</u>

### A.  Relief in a Chapter 15 Proceeding

In 2005, Congress adopted Chapter 15 of the Bankruptcy Code based on the Model Law on Cross-Border Insolvency proposed by the United Nations Commission on International Trade Law in 1997.  Chapter 15 replaced section 304 of the Bankruptcy Code, which originally provided the statutory framework for cases filed in the United States that are ancillary to insolvency proceedings filed in foreign countries.  Section 304 provided a bankruptcy court with broad discretion in fashioning an appropriate remedy in a particular case.  While Chapter 15 replaced section 304, many of the principles underlying section 304 remain in effect under chapter 15, including the principles of comity and cooperation with foreign courts in deciding

whether to grant the foreign representative additional post-recognition relief. *In re SPhinX, Ltd.*, 351 B.R. 103, 112 (Bankr. S.D.N.Y. 2006) ("[C]hapter 15 maintains—and in some respects enhances—the 'maximum flexibility,' that section 304 provided bankruptcy courts . . . in light of principles of international comity and respect for the laws and judgments of other nations." (internal citation omitted)).

Section 1520 outlines the mandatory relief automatically granted upon recognition of a foreign main proceeding under Chapter 15. The relief available under this provision is not at issue in this case. Rather, it is the relief available to the foreign representative at the Court's discretion under sections 1521 and 1507 of the Code which are relevant.

"Section 1521(a) outlines the discretionary relief a court may order upon recognition of a foreign proceeding, whether main or non-main . . . . The discretion that is granted is 'exceedingly broad' since a court may grant 'any appropriate relief' that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors." *In re Atlas Shipping A/S*, 404 B.R. 726, 739 (Bankr. S.D.N.Y. 2009) (internal citation omitted). Section 1521(a) reads as follows:

> (a) Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including—
>> (1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);
>> (2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);
>> (3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);
>> (4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

(6) extending relief granted under section 1519(a); and

(7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

11 U.S.C. § 1521(a).  To determine what relief could fall under the catch-all at the beginning of the subsection ("additional relief"), courts look to relief available under the now-deleted section 304 of the Code.  Courts give varying weight to section 304 precedent.  *See In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1057 (5th Cir. 2012) (holding that relief available under section 1521(a) is "co-extensive" with that available under section 304); *compare In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 114 (Bankr. S.D.N.Y. 2012) (viewing section 304 caselaw as providing "useful precedents").  Relief under section 1521 will be granted only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected.  11 U.S.C. § 1522(a).

Section 1507 provides additional discretionary grounds for the Court to grant relief to the foreign representative.  Section 1507 reads:

(a) Subject to the specific limitations stated elsewhere in this chapter the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States.

(b) In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—

(1) just treatment of all holders of claims against or interests in the debtor's property;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of the debtor;

(4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

(5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

9

11 U.S.C. § 1507.

Section 1506 provides that a bankruptcy court may decline to grant relief requested in a

chapter 15 case if the action would be "manifestly contrary to the public policy of the United

States." 11 U.S.C. §§ 1506. This public policy exception is narrowly construed. *See In re

Ocean Rig UDW Inc.*, 570 B.R. 687, 707 (Bankr. S.D.N.Y. 2017); *see also In re Toft*, 453 B.R.

186, 195 (Bankr. S.D.N.Y. 2011) ("[T]hose courts that have considered the public policy

exception codified in [section] 1506 have uniformly read it narrowly and applied it sparingly.").

### B.  Exculpations in Chapter 11s

"Exculpation provisions are designed to 'insulate court-supervised fiduciaries and some

other parties from claims that are based on actions that relate to the restructuring.'" *In re

Genesis Glob. HoldCo, LLC*, 660 B.R. 439, 527 (Bankr. S.D.N.Y. 2024) (quoting *In re Aegean

Marine Petroleum Network Inc.*, 599 B.R. 717, 720 (Bankr. S.D.N.Y. 2019)). "It is well settled

that an exculpation clause approved at confirmation may exculpate estate fiduciaries like a

committee, its members, and estate professionals for their actions in the bankruptcy case except

where those actions amount to willful misconduct or gross negligence." *In re LATAM Airlines

Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June 18, 2022)

(citations omitted). Such provisions in chapter 11 plans are "not uncommon" and are generally

permissible "so long as they are properly limited and not overly broad." *Id*. at *49 (quoting *In re

Nat'l Heritage Found., Inc.*, 478 B.R. 216, 233 (Bankr. E.D. Va. 2012)).

Generally, it has been recognized that:

> [A] proper exculpation provision is a protection not only of court-supervised
> fiduciaries, but also of court-supervised and court-approved transactions. If this
> Court has approved a transaction as being in the best interests of the estate and has
> authorized the transaction to proceed, then the parties to those transactions should
> not be subject to claims that effectively seek to undermine or second-guess this

10

Court's determinations.   In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do.

*Aegean Marine Petroleum Network*, 599 B.R. at 721.

In the Chapter 11 context, "in general, exculpated parties who are not estate fiduciaries are entitled to benefit from a broad exculpation provision where they have been actively involved in all aspects of the Chapter 11 Cases and have made significant contributions to the success of the cases." *In re Wythe Berry Fee Owner LLC*, No. 22-11340 (MG), 2024 WL 2767121, at *13 (Bankr. S.D.N.Y. May 29, 2024) (cleaned up).  This Court in *Wythe Berry* exculpated a creditor group, among others, because its participation "was instrumental to the Debtor formulating a plan on an expedited basis, and their support was essential to the successful negotiation of the Plan" and related agreements.  *Id.* (cleaned up).  And while the exculpation reached beyond the set of estate fiduciaries, it still was limited just to "court-supervised and court-approved transactions." *Aegean Marine Petroleum Network*, 599 B.R. at 721.  *See also In re Residential Cap. LLC*, Case No. 12-12020 (MG), 2013 WL 12161584, at *13 (Bankr. S.D.N.Y. Dec. 11, 2013) (order confirming plan contained exculpations for parties "instrumental to the successful prosecution of the Chapter 11 Cases or their resolution pursuant to the Plan, and/or provided a substantial contribution to the Debtors"); *KG Winddown, LLC, et al.*, Case No. 20-11723 (MG) (Bankr. S.D.N.Y. 2020) (ECF Doc. # 494) (permitting exculpation of purchaser as non-estate fiduciary); *Genco Shipping & Trading Ltd.*, Case No. 14-11108 (SHL) (Bankr. S.D.N.Y. July 2, 2014) (ECF Doc. # 322) (approving exculpation provision in plan providing exculpation for non-estate fiduciaries).  "In determining whether to approve exculpation provisions, courts also consider whether the beneficiaries of the exculpation participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan . . . .  Courts in this and other districts have approved exculpation provisions . . . for estate fiduciaries and non-

11

estate fiduciaries." *In re: Klaynberg*, No. 22-10165 (MG), 2023 WL 5426748, at \*17–18

(Bankr. S.D.N.Y. Aug. 22, 2023).  Finally, courts in the Second Circuit allow exculpation

provisions so long as they apply to post-petition conduct and explicitly exclude gross negligence

and willful misconduct.  *Id.* ("Courts in the Second Circuit have held that [exculpation

provisions] . . . are appropriate when confined to postpetition activity and explicitly exclude

gross negligence and willful misconduct.").  *But see In re PTL Holdings LLC*, No. 11-12676

BLS, 2011 WL 5509031, at \*12 (Bankr. D. Del. Nov. 10, 2011) (sustaining UST's objection to

exculpation of non-estate fiduciaries and limiting exculpation clause to just estate fiduciaries).

    Additionally, courts in this district have exculpated behavior that occurred after the

effective date of a plan of reorganization when that behavior was "authorized by bankruptcy

courts to carry out the bankruptcy process."  *See In re Ditech Holding Corp.*, No. 19-10412

(JLG), 2021 WL 3716398, at \*9 (Bankr. S.D.N.Y. Aug. 20, 2021) ("It is settled that exculpatory

provisions are proper to protect those authorized by bankruptcy courts to carry out the

bankruptcy process, even after the effective date of a plan . . . .  The Exculpation Provision

expressly covers acts falling under the 'administration of the Plan'—which by definition occurs

post-Effective Date . . . .  [T]he Exculpation Provision in Section 10.7 of the Plan applies to

shield the conduct of these Individual Defendants [in implementing the plan] from collateral

attack in a separate lawsuit."); *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. at 720 ("I

think that a proper exculpation provision is a protection not only of court-supervised fiduciaries,

but also of court supervised and court-approved transactions . . . .  In the absence of gross

negligence or intentional wrongdoing, parties should not be liable for doing things that the Court

authorized them to do and that the Court decided were reasonable things to do."); *In re Granite

Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation clause "for

actions in connection, related to, or arising out of the Reorganization Cases," noting that the language "generally follows the text that has become standard in this district and is sufficiently narrow to be unexceptional" and that "the Plan provides exculpation only for acts or omissions in connection with the Plan and the bankruptcy cases. It requires, in effect, that any claims in connection with the bankruptcy case be raised in the case and not be saved for future litigation."); *In re Flushing Hosp. & Med. Ctr.*, 395 B.R. 229, 235 (Bankr. E.D.N.Y. 2008) ("It is apparent that the exculpation provisions quoted above are not limited to pre-effective date claims. By their terms, these provisions apply to 'any act or omission in connection with, or arising out of . . . the administration of the Plan.' Adopting [the objector's] interpretation would render the 'administration of the Plan' clause meaningless, because conduct during the administration of the Plan necessarily occurs after the effective date of the Plan.").

Exculpations have been granted by courts in this district in Chapter 15 cases, including protection of non-fiduciaries. *See, e.g.*, *In re Olinda Star Ltd.*, 614 B.R. 28, 48 (Bankr. S.D.N.Y. 2020) (exculpating, among others, the indenture trustees and record holders of certain debtor-issued notes, as well as an information agent, because "such relief is necessary and appropriate to prevent interference with the consummation of" the foreign scheme of arrangement and "because without such exculpations the ability of [the foreign debtors' liquidators] and their advisors to take action to effectuate the restructuring would be limited"); *In re Oi S.A.*, 587 B.R. 253, 269 n.3 (Bankr. S.D.N.Y. 2018) (noting that the court found that the exculpation requested by the foreign representative was "appropriate under the circumstances").

## C. *Purdue* in Chapter 15s

Courts in this district have long enforced foreign restructuring plans in Chapter 15 cases which include nonconsensual third-party releases, most doing so pursuant to sections 1507 and

1521 of the Code. *See, e.g., In re Ocean Rig UDW Inc.*, 570 B.R. 687 (Bankr. S.D.N.Y. 2017)

(recognizing and enforcing scheme of arrangement that released affiliate guarantees); *In re*

*Towergate Fin. plc*, Case No. 15–10509–SMB (Bankr. S.D.N.Y. Mar. 27, 2015) (ECF Doc. #

16); *In re New World Res. N.V.*, Case No. 14-12226-SMB (Bankr. S.D.N.Y. Sept. 9, 2014) (ECF

Doc. # 20); *In re Sino–Forest Corp.*, 501 B.R. 655, 665 (Bankr. S.D.N.Y. 2013) (enforcing

foreign order containing third-party releases); *In re Magyar Telecom B.V.*, Case No. 13-13508-

SHL, 2013 WL 10399944 (Bankr. S.D.N.Y. Dec. 11, 2013) (ECF Doc. # 26); *In re Metcalfe &*

*Mansfield Alt. Inv.,* 421 B.R. 685, 696 (Bankr. S.D.N.Y. 2010) (concluding that "principles of

enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of

enforcement in the United States of the third-party non-debtor release and injunction provisions

included in the Canadian Orders, even if those provisions could not be entered in a plenary

chapter 11 case.").

    The Supreme Court held in *Purdue* that "the Bankruptcy Code does not authorize a

bankruptcy court to approve, as part of a plan of reorganization under Chapter 11, a release and

injunction that extinguishes claims against non-debtor third parties without the consent of

affected claimants."  603 U.S. 204, 204 (2024).  To date, only one written decision has been

issued on the question whether *Purdue* applies in chapter 15 proceedings: *In re: Credito Real,*

*S.A.B. de C.V., SOFOM, E.N.R.*, No. 25-10208 (TMH), 2025 WL 977967, at *1 (Bankr. D. Del.

Apr. 1, 2025).  The *Credito Real* case is discussed below.

### III.    DISCUSSION

    For this Court to provide the relief requested by the Foreign Representative, it must be

available to the Foreign Representative under either sections 1507 or 1521 of the Code.  The

authority to issue the exculpation and the third-party release contained in the Order must,

therefore, stem from one of these two sections of the Code.

One of the UST's objections is consistent across both provisions: that the provision

provides relief beyond the scope provided by the Brazilian Confirmation Order and the RJ Plan.

This objection is addressed first, followed by provision-specific objections.

**A. Provision of Relief Outside Scope of Foreign Court Orders and Plan**

Both the text of Chapter 15 and caselaw building upon it indicate that U.S. courts

operating pursuant to Chapter 15 are *not* limited in the discretionary relief they grant by that

relief afforded by the foreign court or the plan of reorganization.  There are limitations to courts'

discretionary powers under Chapter 15, but they are not obligated to grant only that relief which

is similar or parallel to that granted abroad or specified in the plan at issue.

The text of Chapter 15 of the Code indicates that U.S. courts, despite being ancillaries to

foreign proceedings when operating under Chapter 15, *see In re Foreign Econ. Indus. Bank Ltd.,*

*"Vneshprombank" Ltd.*, 607 B.R. 160, 168 (Bankr. S.D.N.Y. 2019), are not hamstrung by the

operations of foreign courts and law when determining what relief to grant to the foreign

representative.  Section 1521(a) enables courts to grant "any appropriate relief" so long as that

relief is "necessary to effectuate the purpose of [Chapter 15] and to protect the assets of the

debtor or the interests of the creditors" (followed by a non-exclusive list of examples of the type

of relief the court may grant).  Section 1507 permits a court to grant "additional assistance"

subject to "specific limitations stated elsewhere in" Chapter 15, so long as the "additional

assistance" is available "under this title or under other laws of the United States."  Under the

"expansive grant of power" in section 1507, "even if a court cannot grant relief under section

1521(a)(7), it may grant relief under section 1507." *Credito Real*, 2025 WL 977967, at *11.  The

drafters of Chapter 15 referenced principles of comity as limiting factors, rather than foreign

rulings or even the availability of relief under foreign law. *See* 11 U.S.C. § 1507(b) (requiring

court to consider "the principles of comity" when deciding whether to grant relief); *In re Comair

Ltd.*, No. 21-10298(JLG), 2021 WL 5312988, at *9 (Bankr. S.D.N.Y. Nov. 14, 2021) ("Post-

recognition relief under section 1521 'is largely discretionary and turns on subjective factors that

embody the principles of comity.'") (internal citation omitted).

The relief provided in the Recognition Order puts an enforcement mechanism in the U.S.

order that prevents disgruntled creditors who are bound by the RJ Plan from suing in the U.S.to

recover on claims that are barred by the RJ Plan. Granting this relief to the Foreign

Representative is in furtherance of comity, as it enables the full enforcement of the RJ Plan by

closing the door to potential workarounds to the Plan.

### B. Exculpation

The provision in the Order which provides for an exculpation reads as follows:

> The Directed Parties and their respective officers, directors, employees,
> representatives, advisors, attorneys, professionals and managers, in each case,
> solely in their respective capacities as a Directed Party, shall be entitled to a full
> limitation of liability from and shall have no liability for any and all claims,
> obligations, suits, judgments, damages, rights, causes of action, liabilities from, or
> in connection with, any action or inaction taken in furtherance of and/or in
> accordance with this Order, these Chapter 15 Cases, the Brazilian RJ Proceeding,
> the Brazilian Confirmation Order and the RJ Plan, except for any liability arising
> from any action or inaction constituting gross negligence, fraud, willful misconduct
> or professional malpractice as determined by this Court.

(Order ¶ 7**.**)

The UST objected to the provision of this relief, as discussed above. It relies on a Fifth

Circuit case, *Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1044 (5th Cir. 2012), to structure its analysis

of section 1521 and 1507. The Fifth Circuit in *Vitro* adopted a three-step framework to

determine whether relief requested by a foreign representative is available: "a court . . . should

first consider the specific relief enumerated under § 1521(a) and (b).  If the relief is not explicitly

provided for there, a court should then consider whether the requested relief falls more generally

under § 1521's grant of any appropriate relief.  We understand 'appropriate relief' to be relief

previously available under Chapter 15's predecessor, § 304.  Only if a court determines that the

requested relief was not formerly available under § 304 should a court consider whether relief

would be appropriate as 'additional assistance' under § 1507."  *Id.* at 1054.  Following this

rubric, the UST argued that none of the seven enumerated bases for relief under section 1521

apply: the first five concern the debtor and do not explicitly authorize exculpations, the sixth

concerns extension of relief upon the filing of a petition, and the seventh concerns the relief

available to a trustee which the UST claimed is irrelevant to the limitation of liability in the

Order.  (Objection at 12.)  The UST also found no support for the exculpation in section 1507.

Without providing much support for its argument, it claimed that the foreign representative "can

only get the relief that is set forth in the RJ Plan or is otherwise sanctioned by the Bankruptcy

Code—neither of which circumstance exists here."  (Objection at 17.)  The first part of this

argument—that this Court cannot grant such an exculpation because the exact relief is not in the

RJ Plan—is addressed and rejected above.  The second part of the argument—that such

exculpation is not "sanctioned by the Bankruptcy Code"—is addressed below.

First, courts in this district are not bound by the analytical approach taken in *Vitro*.  *See,*

*e.g.*, *In re PT Bakrie Telecom Tbk*, 628 B.R. 859, 877 (Bankr. S.D.N.Y. 2021) (noting that, as

between sections 1521 and 1507, "often courts have found it unnecessary to determine the

primacy of these two provisions if the outcome would be the same under either section," and

collecting cases); *In re Atlas Shipping*, 404 B.R. at 741 (granting relief under section 1521 and

concluding that it was unnecessary to determine whether "additional assistance" was available under section 1507).

Courts can provide exculpations in Chapter 15 proceedings to the same extent they can in Chapter 11 cases pursuant to sections 1507 and 1521, so long as the exculpation is not contrary to U.S. public policy in violation of section 1506.

In the Chapter 11 context, at least in this district, non-estate fiduciaries are entitled to exculpation when they have been actively involved in the bankruptcy proceeding and made significant contributions to its success, and when the exculpation applies to court-supervised and -approved transactions. *In re Wythe Berry Fee Owner LLC*, 2024 WL 2767121, at *13; *In re: Klaynberg*, No. 22-10165 (MG), 2023 WL 5426748, at *17 (Bankr. S.D.N.Y. Aug. 22, 2023) (noting that courts also look to whether parties have acted in good faith and look to whether the exculpation provision is critical to plan implementation). Gross negligence and willful misconduct must be excluded from the scope of the exculpation provision. *In re Wythe Berry Fee Owner LLC*, 2024 WL 2767121, at *13. The logical analogue in the Chapter 15 context is exculpation of parties who have been actively involved in the foreign restructuring, and who are exculpated for behavior relating to court-supervised and -approved transactions, whether those transactions are supervised here or abroad. (Where a foreign plan is enforced in the U.S. pursuant to a Chapter 15 recognition proceeding, the U.S. court may also be the one supervising and approving.) Here, the exculpated parties (the Directed Parties) are the indenture trustee of certain notes cancelled pursuant to the RJ Plan, the custodians of those notes, and the clearing system involved with the effectuation of the RJ Plan. (Order ¶ 7.) These parties are clearly essential to the implementation of the RJ Plan, which is being supervised by a Brazilian court. There is no indication in the record before the Court that the Directed Parties have acted in

anything but good faith.  Moreover, the Foreign Representative has submitted that the

cancellation of these notes is "one of the central parts of the RJ Plan" and that without the

cooperation of the Directed Parties, they cannot be cancelled; no party has contested this claim.

(Reply at 9.)  The exculpation provision in the Order is, therefore, integral to the recognition and

enforcement of the RJ Plan.  The Court finds that the exculpation provision in the Order

complies with the requirements courts place on exculpation provisions in Chapter 11 cases.  *See
also In re Olinda Star*, 614 B.R. at 48 (granting exculpation when "necessary and appropriate to

prevent interference with the consummation of the foreign restructuring scheme").

### C.  Putative Nonconsensual Third-Party Release

The provision in the Order which the UST claims creates impermissible third-party

releases reads as follows:

> Except as provided in paragraph 12 of this Order, all persons and entities are
> permanently enjoined and restrained from (i) commencing or taking any action or
> asserting any claim, within the territorial jurisdiction of the United States, that is
> inconsistent with, in contravention with, or would interfere with or impede the
> administration, implementation and/or consummation of the RJ Plan, the Brazilian
> Confirmation Order or the terms of this Order; and (ii) taking any action against the
> Debtors or their property located in the territorial jurisdiction of the United States
> to recover or offset any debt or claims that are extinguished, novated, cancelled,
> discharged or released under the RJ Plan and the Brazilian Confirmation Order. No
> action may be taken within the territorial jurisdiction of the United States to confirm
> or enforce any award or judgment that would otherwise be in violation of this Order
> without first obtaining leave of this Court.

(Order ¶ 11.)

It is not clear that this language creates a third-party release: unlike most third-party

releases, the third parties are on the plaintiff's side of the "v." ("all persons and entities,"

language which conceivably covers more than just the debtors' creditors and claimholders),

as the defendant's side consists only of "the Debtors [and] their property."[3]  Assuming

*arguendo* that paragraph 11 of the Order does create nonconsensual third-party releases,

the Court finds that it has the power to issue such an order in a Chapter 15 case, pursuant

to at least section 1521, in support of a foreign proceeding.

Since subsections 1521(a)(1)–(7) do not expressly authorize non-debtor third-party

releases, a court should decide whether the requested relief can be considered "appropriate

relief" under section 1521(a).  To do so, the Court must first examine the plain language of

section 1521.  *Grajales v. Comm'r of Internal Revenue*, 47 F.4th 58, 62 (2d Cir. 2022)

("Statutory interpretation always begins with the plain language of the statute.") (internal citation

and quotation marks omitted).  It will then look at caselaw from Chapter 15's predecessor,

section 304, which, as noted above, is instructive in interpreting the scope of section 1521(a).

    1.  <u>Text of Chapter 15</u>

Judge Horan's recent opinion in *Credito Real* provides a lucid explanation why courts

can enforce nonconsensual third-party releases found in foreign plans of reorganization.  Here,

all parties agreed during the recognition hearing that there is no third-party release in the RJ

Plan, or even in the Brazilian court order confirming the RJ Plan.  Rather, there is a provision in

*this* Court's order recognizing the Brazilian proceeding as the foreign main proceeding and

enforcing the RJ Plan which might be construed as a nonconsensual third-party release.

However, there is no meaningful difference between *enforcing, via order, a foreign plan* with a

---

[3]    If this provision is not, in fact, a third-party release, it should be considered an injunction in support of the
RJ Plan, given that, as the Foreign Representative convincingly explained, this section of the Order is carefully
limited to bar only those actions that contravene relief provided in the RJ Plan and the Brazilian Confirmation Order.
(Reply at 6.)  All this provision does, per the Foreign Representative, is enforce the relief granted in the Brazilian RJ
Proceeding within the territorial jurisdiction of the United States.  (*Id.*)  Under this reading, the provision would be
enforced as a foreign plan-supporting injunction, a type of relief available under section 1521 of the Code.  *See, e.g.*,
*In re Rede Energia S.A.*, 515 B.R. 69, 93 (Bankr. S.D.N.Y. 2014); *In re Olinda Star*, 614 B.R. at 47–48.

third-party release provision, and *issuing an order enforcing a foreign plan*, which order contains

a third-party release which itself is not in the foreign plan.  The practical effect is the same—a

U.S. court issues an order, which takes effect in the United States, which releases claims over

which the U.S. court has jurisdiction.

In *Credito Real*, Judge Horan addressed a common objection to the grant of third-party

releases under sections 1521 and 1507, one which the UST made here: that courts must apply

*Purdue*'s *ejusdem generis* approach to interpreting section 1123(b) of the Code to sections 1521

and 1507, and in so doing, find that courts have no authority to grant third-party releases under

those sections.  Judge Horan walked through the differences in language between section

1123(b) and, in turn, 1521 and 1507, to find that courts wield significantly more power under the

latter two sections.   Regarding section 1521, he notes first that it allows a court to grant "any"

appropriate relief, and then provides a non-exhaustive list of examples.  2025 WL 977967 at *9.

Section 1521(a)(7) qualifies the "any . . . including" language in the section "by explaining that

any additional relief a court grants should be of the kind that is available to a trustee."  *Id.* at *10.

(Per Judge Horan, it is "well-settled that enforcement of a third-party release contained in a

foreign plan is appropriate under that section."  *Id.* (*citing In re Arctic Glacier Int'l, Inc.*, 901

F.3d 162 (3d Cir. 2018) (enforcing third party releases in a Canadian plan of arrangement); *In re

Avanti Commc'ns Grp. PLC*, 582 B.R. at 618 (finding that it had the power to enforce third-party

releases under either section 1521(a)(7) or section 1507(a))).)  Section 1521 thus differs from

section 1123(b), which "simply states that a court may include any 'other' chapter 11 plan

provision that is not "inconsistent with the applicable provisions of this title.'"  *Id.*  The Supreme

Court in *Purdue* read "other" as directing courts to look to the other provisions of 1123(b) to

determine what further relief a court could grant.  But "section 1521(a) does not direct courts to

21

look to the 'other' provisions"—listed in subsections (a)(1)–(7)—"when providing relief under

its catchall," instead allowing "courts to grant 'any additional relief that may be available to a

trustee.'" *Id.* The limitation in section 1521(a), therefore, is not whether the relief is similar to

those listed in 1521(a)(1)–(7), but whether the relief is available to the trustee. Moreover,

section 1521(a)(7) qualifies its "any . . . including" language by listing specific relief a court is

*barred* from granting under that section—and that list of prohibited relief does not include

nonconsensual third-party releases. "By establishing explicit boundaries, Congress allowed

relief that does not exceed those boundaries . . . . By specifically enumerating relief that the

court cannot grant under section 1521, Congress more concretely defined the outer bounds of

what the court can grant, thus also more concretely defining what is included in what the court

can grant, bearing in mind the guiding principles of comity and cooperation." *Id.*; *see also id.* at

*11 (citing the canon of *expressio unius* to support the conclusion). Judge Horan conducts a

similar analysis of section 1507 to again find that, unlike section 1123(b), it establishes a broad

set of powers and precisely defines the court's limitations under that section, "provid[ing] a more

explicit and fuller picture of the broad relief a court may grant, as compared to that in section

1123(b)(6)." *Id.* at *11. In sum, both sections 1521 and 1507 differ from 1123(b)

"because section 1123(b) does not expressly establish specific boundaries; instead, it directs

courts to look to the rest of the Bankruptcy Code to determine whether a provision is appropriate.

Because Congress expressed specific prohibitions [in 1521 and 1507], courts do not need to read

further into its words like they do for section 1123(b). The plain language of section

1507 (and section 1521) already enumerates the boundaries unambiguously." *Id.* at *12.

Section 1522(a) permits the Court to grant relief pursuant to section 1521 only if the

interests of creditors, the debtor, and other interested entities are "sufficiently protected."

"Sufficient protection" embodies "three basic principles: 'the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law.'" *Atlas Shipping*, 404 B.R. at 740. The Court finds that, in the present case, the issuance of a third-party release which enables the distribution of the foreign debtor's estate in the manner set forth in the RJ Plan enables the just treatment of all claimants, substantially in accordance with U.S. law.

Section 1506 provides another boundary: a bankruptcy court may decline to grant relief requested in a Chapter 15 case if the action would be "manifestly contrary to the public policy of the United States." 11 U.S.C. §§ 1506. This public policy exception is narrowly construed. *See In re Ocean Rig UDW Inc.*, 570 B.R. at 707. *Purdue* did not hold that nonconsensual third-party releases are contrary to the public policy of the U.S. In fact, the majority expressly stated that "[b]oth sides of this policy debate may have their points." *Purdue*, 603 U.S. at 226. The Supreme Court's holding was narrow: Chapter 11 of Title 11 does not provide bankruptcy courts, in Chapter 11 cases, with the authority to authorize such releases. It cannot be read to hold that nonconsensual third-party releases are "manifestly contrary to" U.S. public policy such that they would be barred by section 1506. *See also Credito Real*, 2025 WL 977967, at *15–16 (similar).

Following the logic of *Credito Real* and *Purdue*, the Court finds that the text of section 1521 permits the grant of a nonconsensual third-party release in support of a foreign debtor's plan of reorganization. Pre-Code caselaw, as well as opinions interpreting section 304, also support this finding.

Longstanding precedent holds that bankruptcy courts can strip U.S. parties of rights they

have under the laws of the United States.  As far back as 1883, the Supreme Court sanctioned the

enforcement of a Canadian scheme of arrangement under which certain bonds would be issued to

replace prior ones.  U.S. bondholders argued that the scheme of arrangement, to which they had

not consented, was imposed in such a way that violated the U.S. Constitution's bar on certain

contractual impairments and hence the scheme should not be recognized by U.S. courts; the

Supreme Court rejected this argument:

> [E]very person who deals with a foreign corporation impliedly subjects himself to
> such laws of the foreign government, affecting the powers and obligations of the
> corporation with which he voluntarily contracts, as the known and established
> policy of that government authorizes.  To all intents and purposes, he submits his
> contract with the corporation to such a policy of the foreign government, and
> whatever is done by that government in furtherance of that policy which binds those
> in like situation with himself, who are subjects of the government, in respect to the
> operation and effect of their contracts with the corporation, will necessarily bind
> him.

*Canada Southern Ry. Co. v. Gebhard*, 109 U.S. 527, 537–38 (1883).  And building on *Gebhard*,

the Second Circuit in *Cunard* dismissed a U.S. lawsuit solely on the grant of comity to a foreign

proceeding.  *Cunard S.S. Co. Ltd v. Salen Reefer Servs. AB*, 49 B.R. 614, 618 (S.D.N.Y. 1985),

*aff'd sub nom. Cunard S.S. Co. v. Salen Reefers Servs. AB*, 773 F.2d 452, 452 (2d Cir. 1985).

The sole concern of the Second Circuit was that the foreign court governing the foreign

proceeding was a court of competent jurisdiction, and that enforcement of the foreign proceeding

would not violate public policy in the U.S.; the fact that U.S. law would have led to a different

outcome, and even the fact that a right granted by U.S. law was being stripped by enforcement,

did not matter.  *Id.* at 617–19.

A battery of similar cases makes it clear that a party can lose rights in an ancillary

proceeding which it otherwise would have had in a plenary case under the Bankruptcy Code.

*See, e.g.*, *In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 337 (S.D.N.Y. 2006) (recognizing Canadian order as an exercise of comity even though it overrode a defendant's constitutional right to a civil jury trial); *In re Bd. of Directors of Multicanal S.A.*, 307 B.R. 384, 389–91 (Bankr. S.D.N.Y. 2004) (holding that foreign law can "override" U.S. law (specifically, the Trust Indenture Act) via the enforcement of a foreign plan pursuant to section 304 which deprived a creditor of rights that he would have had under the TIA); *see also Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 999–1000 (2d Cir.1993) (dismissing bondholders' federal securities fraud action in granting comity to Australian insolvency proceeding, as it would have been "inefficient and inequitable to permit the individual claims to go forward. Indeed, since these individuals were sued solely because of their affiliation with the [foreign debtors], to allow these claims to go forward in the United States . . . would defeat the purpose of granting comity in the first place."); *Lindner Fund, Inc. v. Polly Peck Int'l PLC*, 143 B.R. 807, 807–11 (S.D.N.Y.1992) (dismissing federal securities fraud action in favor of foreign reorganization based on comity and noting that "American courts have traditionally extended comity to foreign bankruptcy proceedings by dismissing actions filed by creditors in United States courts"); *Smith v. Dominion Bridge Corp.*, No. 96-7580, 1999 WL 111465, at *1–5 (E.D. Pa. Mar. 2, 1999) (staying action against foreign debtor in U.S. courts out of comity considerations, and noting that courts have, under certain circumstances, extended the stay to cover non-debtor co-defendants).

As the Second Circuit has previously stated, "deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States." *United JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005). So long as these guidelines are respected, a long string of caselaw indicates that bankruptcy courts may, acting as ancillaries to foreign

proceedings, extinguish claims that would be available in plenary actions in the U.S. in the name of comity.

2.  Pre-*Purdue* Caselaw

Given the above analysis, it is not surprising that pre-*Purdue* chapter 15 courts which faced the question whether limitations on a bankruptcy court's powers in plenary cases carried over into the chapter 15 context came to the same conclusion that courts operating under section 304 did: ancillary cases are fundamentally different, and limitations that exist in plenary cases do not always carry over.  In *In re Metcalfe & Mansfield Alternative Invs.*, the court had to determine whether a third-party release which might not be available in a plenary case under chapter 11 should be granted in a chapter 15.  421 B.R. at 694.  The potential limiting factor there was not the appropriateness of the release under *Metromedia* (moot post-*Purdue*), but a more fundamental one—the *jurisdictional* limitation on chapter 11 courts in *Manville*.  The *Metcalfe* court determined that the scope of its authority to release non-debtors in plenary proceedings did not matter because such jurisdictional limitations did not carry over into the chapter 15 context: "whatever the precise limits of a bankruptcy court's jurisdiction to approve a third-party non-debtor release and injunction in a plenary chapter 11 case, the important point for present purposes is that the jurisdictional limits derive from the scope of bankruptcy court 'related to' jurisdiction under 28 U.S.C. § 1334, and the prudential limits courts have applied in chapter 11 cases under the Bankruptcy Code. This Court is not being asked to approve such provisions in a plenary case; rather, the Court is being asked to order enforcement of provisions approved by the Canadian courts. The correct inquiry, therefore, is whether the foreign orders should be enforced in the United States in this chapter 15 case." *Id.* at 695–96.  The *Metcalfe* court then moved onto what it considered to be the sole limiting factor: whether *principles of*

26

*comity* counseled in favor of the grant. *Id.* *Metcalfe* was a section 1507 case, but its holding

carries over into section 1521: there is no reason why a jurisdictional limitation *on bankruptcy*

*courts acting in plenary cases* should hamper courts' ability to act as ancillaries to foreign

proceedings. Its logic still holds after *Purdue*: *Purdue* only held that *chapter 11* of the Code

does not give courts the power to grant such releases, and did not say anything about limitations

on the power of courts to act as ancillaries to foreign proceedings under chapter 15.

To summarize, (1) the plain text of Chapter 15, (2) caselaw under its predecessor (section

304), and (3) pre-*Purdue* caselaw in this district all support a finding that courts can, pursuant to

section 1521 of the Code, issue orders pursuant to their discretionary powers under section 1521

which contain nonconsensual third-party releases, whether or not those releases originate from a

foreign court. Having found that this power exists under section 1521, this Court need not

conduct a full analysis of section 1507 to determine whether it, too, so permits. *See In re Sino-*

*Forest Corp.*, 501 B.R. at 666 (recognizing and enforcing foreign court order approving non-

debtor release); *In re Avanti Commc'ns Grp. PLC*, 582 B.R. at 618 (same); *Metcalfe &*

*Mansfield*, 412 B.R. at 696 (same).

## IV.    CONCLUSION

For the foregoing reasons, this Court finds that it had the authority under the Code to

issue the Order as written. The United States Trustee's objections were **OVERRULED**.

Dated: April 21, 2025
       New York, New York

                                        *Martin Glenn*
                                        MARTIN GLENN
                                 Chief United States Bankruptcy Judge